United States Courts
Southern District of Texas
FILED

JUN 1 6 2016

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Criminal No. |
| | § | UNDER SEAL |
| DR. SOHAIL R. SIDDIQUI and STARSKY D. BOMER, | § § § | 16 CR 0257 |
| Defendants. | § § | |

16 CR 0257

### INDICTMENT

The Grand Jury charges:

Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1.  The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2.  Medicare was subdivided into multiple Parts. Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness. The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3.  Patients eligible for Medicare coverage of a PHP comprised two groups: (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is

in lieu of continued inpatient treatment; and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4. Medicare guidelines required that patients admitted to a PHP require PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5. Under the PHP benefit, Medicare covered the following services: (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose was the treatment of the patient's condition; (7) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6. Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7. Medicare did not cover programs providing primarily social, recreational or diversionary activities. Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization or vocational rehabilitation were not covered by Medicare.

8. Medicare required that the PHP was provided at a facility that was based in or affiliated with a hospital or provided at a community mental health center.

9. Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10. Hospitals, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11. Medicare paid hospitals and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12. CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

13. To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified that: (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14. A Medicare claim for PHP reimbursement was required to set forth the following, among other things: the beneficiary's name and unique Medicare identification number; the item or service provided to the beneficiary; the date the item or service was provided; the cost of the

3

item or service; and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

The Defendants and Hospital A

15. A Texas limited partnership did business as a long-term acute care hospital ("Hospital A") in Stafford, Texas.

16. Defendant **DR. SOHIAL R. SIDDIQUI**, a resident of Fort Bend County, Texas, was part-owner and manager of Hospital A.

17. Defendant **STARSKY D. BOMER**, a resident of Galveston County, Texas, was the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") of Hospital A.

18. Co-Conspirator 1 ("CC-1") owned and operated Extra Care PHP located in Houston, Texas.

19. In or about March 2011, defendant **DR. SOHAIL R. SIDDIQUI**, CC-1, and others agreed to operate Extra Care PHP as an outpatient department of Hospital A. In or about April 2011, defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, their co-conspirators, and others changed Extra Care PHP's name to "TriMed Partial Hospitalization Program" ("TriMed PHP") and operated TriMed PHP from a strip mall located at 3505 South Dairy Ashford Street in Houston.

20. In or about August 2011, defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others opened a second outpatient department of Hospital A that they operated as a PHP named "Liberty Partial Hospitalization Program" ("Liberty PHP"). Liberty PHP operated from inside a community center that was located at 9009 Boone Road in Houston.

21. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others operated and managed TriMed PHP and Liberty PHP (collectively the "Hospital A PHPs") and directed their day-to-day operations.

22. Co-Conspirator 2 ("CC-2"), a resident of Fort Bend County, Texas, owned group homes that CC-2 rented to Medicare beneficiaries and others. CC-2 acted as patient recruiter or "marketer" for Hospital A's PHPs and other PHPs. CC-2 referred Medicare beneficiaries who lived in CC-2's group homes and elsewhere to Hospital A's PHPs and other PHPs in exchange for kickbacks.

23. Co-Conspirator 3 ("CC-3") operated a van service that transported Medicare beneficiaries who were referred to Hospital A's PHPs by CC-2 and other marketers. CC-3 paid CC-2 kickbacks for transporting CC-2's Medicare beneficiaries to and from Hospital A's PHPs each day.

24. Hospital A submitted claims to Medicare for PHP and other services that defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others purported to provide to Medicare beneficiaries at Hospital A and Hospital A's PHPs.

The Defendants and Pristine Hospital of Pasadena

25. Pristine Healthcare LLC d/b/a "Pristine Hospital of Pasadena" ("Pristine") was a general care hospital located at 1004 Seymour Street in Pasadena, Texas. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER** were part-owners of Pristine. Defendant **DR. SOHAIL R. SIDDIQUI** was also Pristine's registered agent and manager.

26. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER** obtained a Medicare provider for Pristine.

27. In or about August 2012, defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others stopped operating the Hospital A PHPs as outpatient departments of Hospital A and began operating them as outpatient departments of Pristine. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others changed the names of TriMed PHP and Liberty PHP to "Pristine PHP Southwest" and "Pristine PHP Liberty," respectively, but continued to operate the PHPs from 3505 South Dairy Ashford Street and 9009 Boone Road in Houston.

28. In or about October 2012, Pristine opened a third outpatient department that defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others operated as a PHP named "Pristine PHP New Horizons." Pristine PHP New Horizons was located at 10960 Stancliff Road in Houston.

29. CC-2 and other marketers referred Medicare beneficiaries to Pristine PHP Southwest, Pristine PHP Liberty, and Pristine PHP New Horizons (collectively the "Pristine PHPs") in exchange for kickbacks.

30. Pristine submitted claims to Medicare for PHP and other services that defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others purported to provide to Medicare beneficiaries at Pristine and the Pristine PHPs.

## COUNT 1
### Conspiracy to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

31. Paragraphs 1 through 30 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

32. From in or about March 2011, through in or about December 2013, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants

**DR. SOHAIL R. SIDDIQUI and
STARSKY D. BOMER**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the grand jury, including CC-1, CC-2, and CC-3, to commit certain offenses against the United States, that is,

    a. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and,

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

33. It was a purpose of the conspiracy for defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, CC-2, CC-3, their co-conspirators, and others to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom Hospital A, Pristine, and others submitted claims to Medicare.

## Manner and Means of the Conspiracy

34. The manner and means by which defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, CC-2, CC-3, their co-conspirators, and others sought to accomplish the purpose and object of the conspiracy included, among other things:

a. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, and others owned and managed Hospital A and, later, they owned and managed Pristine. Defendant **STARSKY D. BOMER** acted as either the CFO, COO, or both of Hospital A and Pristine.

b. Defendants **SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, their co-conspirators, and others managed and directed the operations of Hospital A, Pristine, and the Hospital A and Pristine PHPs.

c. Defendant **STARSKY D. BOMER**, his and defendant **DR. SOHAIL R. SIDDIQUI**'s co-conspirators, and others paid kickbacks to Medicare beneficiaries who did not meet the Medicare qualifications for or need PHP services to induce them to attend the Hospital A and Pristine PHPs.

d. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, their co-conspirators, and others paid CC-2 and other marketers to refer Medicare beneficiaries who did not meet the Medicare qualifications for or need PHP services to the Hospital A and

8

Pristine PHPs. In exchange for these beneficiary referrals, defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, their co-conspirators, and others paid CC-2 and other marketers a kickback for each beneficiary who they referred to the Hospital A and Pristine PHPs.

35. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, CC-2, CC-3, their co-conspirators, and others submitted or caused the submission of approximately $16,942,218 in claims to Medicare for PHP and other services that they claimed that Hospital A, Pristine, and the Hospital A and Pristine PHPs provided to beneficiaries whose attendance at these hospitals and PHPs were induced by kickbacks. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER**, CC-1, CC-2, CC-3, their co-conspirators, and others received approximately $6,392,076 on these claims.

### Overt Acts

36. In furtherance of the conspiracy, and to accomplish its object and purpose, defendants **DR. SOHAIL SIDDIQUI** and **STARSKY D. BOMER**, CC-1, CC-2, CC-3, their co-conspirators, and others committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

   a. On or about August 3, 2012, defendant **SOHAIL R. SIDDIQUI** and his co-conspirators, including defendant **STARSKY D. BOMER** and CC-3, paid and caused the payment of approximately $1,320 to CC-2 in exchange for CC-2 referring Medicare beneficiaries to the Hospital A PHPs for PHP and other services.

   b. On or about August 9, 2012, defendant **SOHAIL R. SIDDIQUI** and his co-conspirators, including defendant **STARSKY D. BOMER** and CC-3, paid and caused the

payment of approximately $1,110 to CC-2 in exchange for CC-2 referring Medicare beneficiaries to the Hospital A PHPs for PHP and other services.

  c. On or about November 2, 2012, defendant **STARSKY D. BOMER** and his co-conspirators, including defendant **DR. SOHAIL R. SIDDIQUI**, paid and caused the payment of approximately $1,620 to CC-2 in exchange for CC-2 referring Medicare beneficiaries to the Pristine PHPs for PHP and others services.

  d. On or about November 8, 2012, defendant **STARSKY D. BOMER** and his co-conspirators, including defendant **DR. SOHAIL SIDDIQUI**, paid and caused the payment of approximately $1,500 to CC-2 in exchange for CC-2 referring Medicare beneficiaries to the Pristine PHPs for PHP and others services.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-5
### Anti-Kickback Statute
### (42 U.S.C. § 1320a-7b(b), 18 U.S.C. § 2)

37. Paragraphs 1 through 30 and 34 through 36 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

38. On or about the dates enumerated below, in Harris County, in the Southern District of Texas, and elsewhere, the defendants

**DR. SOHAIL SIDDIQUI and**
**STARSKY D. BOMER**

and their co-conspirators, including CC-1, CC-2, and CC-3, aiding and abetting others known and unknown to the Grand Jury, as set forth below, did knowingly and willfully offer and pay and did knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be

made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare:

| Count | Defendant | On or about Date | Approximate Amount of Kickback |
|---|---|---|---|
| 2 | **SOHAIL R. SIDDIQUI** paid CC-2 | August 3, 2012 | $1,320 |
| 3 | **SOHAIL R. SIDDIQUI** paid CC-2 | August 9, 2012 | $1,110 |
| 4 | **STARSKY D. BOMER** paid CC-2 | November 2, 2012 | $1,620 |
| 5 | **STARSKY D. BOMER** paid CC-2 | November 8, 2012 | $1,500 |

All in violation of Title 42, United States Code, Section 1320a-7b(b) and Title 18, United States Code, Section 2.

### NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 982(a)(7), 981(a)(1)(C), and 28 U.S.C. § 2461)

39. Pursuant to Title 18, United States Code, Section 982(a)(7), as a result of the criminal offenses charged in Counts One through Five of this Indictment, the United States of America gives defendants

**DR. SOHAIL R. SIDDIQUI** and
**STARSKY D. BOMER**

notice that upon their conviction of any of the charged offenses, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, is subject to forfeiture.

40. Defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER** are notified that upon conviction, a money judgment may be imposed equal to the total value of the

property subject to forfeiture, in the amount of at least $6,392,076 in United States currency, for which defendants **DR. SOHAIL R. SIDDIQUI** and **STARSKY D. BOMER** and their co-conspirators may be jointly and severally liable.

41. In the event that the property subject to forfeiture as a result of any act or omission of a defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461.

A TRUE BILL

_Original Signature on File_
FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

_____
JONATHAN T. BAUM
SENIOR TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE